* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence or to rehear the parties or their representatives, the Full Commission affirms the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. At the time of the alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employee-employer relationship existed between the parties.
3. Defendant Selective Insurance Company was the carrier on the risk.
4. All parties have been correctly designated and there is no question as to misjoinder or non-joinder of parties.
5. Subsequent to the hearing, the parties stipulated that plaintiff's average weekly wage was $454.30, yielding a compensation rate of $303.00.
6. During the hearing, the parties stipulated that plaintiff was out of work from 13 August 2003 through 17 September 2003.
7. Plaintiff was taken out of work by her family physician on 9 October 2003, secondary to back pain and to date has not returned to work for defendant-employer.
8. Plaintiff performed the control links job on September 17, 18, 19, 22, 23, 24, 25, 29 and 30.
9. The issues for determination are:
 a. Whether plaintiff suffered a compensable injury to her back on or about 8 October 2003?
 b. Whether plaintiff's pre-existing conditions were aggravated and exacerbated by the alleged injury by accident of 8 October 2003?
 c. Whether plaintiff's pre-existing conditions were aggravated and exacerbated by her work and whether her work exposed plaintiff to a greater risk than that of the general public of suffering such aggravation and exacerbation of her pre-existing conditions?
d. To what benefits, if any, is plaintiff entitled?
10. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: Medical records, I.C. forms, ergonomic reports and discovery responses.
b. Stipulated Exhibit #2: Videotape
In addition to Stipulated Exhibit(s), the following Exhibits were admitted into evidence:
1. Plaintiff's Exhibit #1: Job log
2. Plaintiff's Exhibit #2: Pay stubs.
 * * * * * * * * * * * ORDER
Plaintiff offered into evidence an 11 pound "control link" part for the Cincinnati Machine for illustrative purposes. Plaintiff's exhibit is admitted into evidence.
 * * * * * * * * * * *
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 64 years old and had completed the 12th grade. She has a medical history of fusion surgery at L5 in 1983. Plaintiff has been previously diagnosed with degenerative disc disease, osteoporosis, facet arthritis and chronic obstructive pulmonary disease. Plaintiff smoked approximately two packs of cigarettes per day for 20 years.
2. Plaintiff has been employed for approximately 30 years performing bench hand assembly work. She began working for defendant-employer as a machine operator on or about 27 February 1995. During her more than eight years of employment with defendant-employer, plaintiff ran several different machines and worked on various parts of different sizes and weights. As a machine operator, plaintiff would load the part, run the part through the machine, take the part out and inspect it, deburr the part (removing sharp edges or metal burrs with a file), then place the part on a slat or into a container for shipment or further operations.
3. On 4 June 2002, plaintiff presented to Dr. Charles Record, her family physician, for a check-up. Plaintiff reported that she was taking four-to-five Goody's powders daily for back and neck pain and that her neck had been bothering her for the prior three-to-four years. Plaintiff declined to receive treatment for her back or neck.
4. On 2 July 2003, plaintiff again noted to Dr. Record that she was taking five to six Goody's powders per day for lower back pain which she stated hurt more after working. At this meeting she informed Dr. Record of her prior surgery. Plaintiff also stated that she was not having any difficulties with her neck at that time.
5. Plaintiff continued to work at her job with defendant-employer until 13 August 2003, when she was laid off for reasons unrelated to any disability. Plaintiff filed a legal claim relating to her lay-off. Plaintiff was rehired or reinstated by defendant-employer on 17 September 2003. When she returned to work, plaintiff was assigned to work the Cincinnati Machine and the Brother Machine. The Cincinnati Machine processed a part called a "control link," weighing approximately 11 pounds. The Brother Machine processed smaller, lighter parts. Plaintiff had primarily worked the Brother Machine prior to this time, and had never worked the Cincinnati Machine before.
6. Plaintiff worked the Cincinnati Machine for eight-hour days on September 17, 18, 19, 22, 23, and 24, for two hours on September 25, eight hours on September 29, and six and one half hours on September 30. During this period, plaintiff experienced back stiffness and had some difficulty placing the part into the machine due to her having to line up holes for pins. To place parts into the machine plaintiff would have to stand, and while bending over with her arms out stretched try to maneuver the 11 pound part into the machine. Plaintiff testified that sometimes the parts would not go in and "you had to keep shimmying it and shimmying it until you could get — until you get it to go." When a piece jammed, plaintiff would get help from other employees with experience on the machine. By the end of September, plaintiff was processing 70-72 pieces per day. Eddie Burdette, plaintiff's supervisor, testified that 125 pieces per day sounded about normal for production on the Cincinnati Machine; however, business owner D.S. Miller and shop foreman Randy Gill stated that the goal for the machine was between 60 and 100 parts per eight hour day.
7. The first week of October 2003, plaintiff worked on the Brother Machine. On 8 October 2003, plaintiff returned to work on the Cincinnati Machine. She testified that her back started hurting "real bad" while "lifting the links" and she could hardly sit on the stool. After approximately one and one half hours, the machine broke down and plaintiff returned to work on the Brother Machine for the remainder of her shift. Plaintiff testified that working on the Cincinnati Machine was very strenuous work.
8. After work, plaintiff presented to Dr. Record for a previously scheduled follow-up appointment regarding treatment she was receiving for a peptic ulcer and other ongoing illnesses related to smoking. At the 8 October 2003 visit, plaintiff noted that her back continued to hurt. She was no longer taking Goody's powders due to an ulcer. Plaintiff also noted that after first getting up in the morning, both legs seemed to lose some feeling. Dr. Record opined that he suspected spinal stenosis as the cause of these symptoms. Dr. Record recommended an MRI, but plaintiff refused due to her fear of the MRI machine.
9. On 9 October 2003, plaintiff returned to work on the Brother Machine. Plaintiff experienced pain and stiffness in her back and had difficulty moving. Prior to her lunch break, plaintiff was informed that the Cincinnati Machine had been repaired and that she would return to that machine after lunch. Plaintiff reported to Mr. Burdette that her back was hurting and she did not think she could run the control link. After lunch, plaintiff went to Randy Gill and told him that her back was hurting and she was leaving for the day.
10. Plaintiff returned home and called Dr. Record to schedule the recommended MRI, which was performed on 13 October 2003. Plaintiff returned to Dr. Record on 17 October 2003, with complaints of continuing back pain that increased with activity. She had no pain in her legs, but frequently felt as though they were going to give way as she walked. The MRI showed degenerative disc disease and facet disease at multiple levels with some relative spinal stenosis, but no nerve root compression. Dr. Record wrote plaintiff out of work retroactive to 8 October 2003 and continuing for an additional two weeks.
11. Plaintiff has not returned to work since 9 October 2003. Plaintiff called Matthew Miller, General Manager for defendant-employer on October 10, 2003, and informed him that she had hurt her back and was going to get an MRI. Several days later, plaintiff called Mr. Miller and informed him she hurt her back while running the Cincinnati Machine. Plaintiff gave timely notice of her injury to defendant-employer verbally and in writing on a Form 18 completed on 4 November 2003.
12. Plaintiff returned to Dr. Record on 29 October 2003. At that time she gave a history that her back had been hurting since July 2003, but that it had not hurt as badly while she was laid off. She also reported that after returning to work in September 2003, she was placed on a new job that required heavy lifting and her pain increased and that her back really started hurting on 8 October 2003, but had improved somewhat by 29 October 2003 since she was not working. Dr. Record opined that plaintiff's job upon her return to work in September 2003, "aggravated her back and caused pain to the point of preventing work for last 2-3 wks at least."
13. On 6 November 2003, plaintiff presented to neurologist Dr. Thomas Mascenik for an evaluation of her back pain and leg weakness. Following his examination and review of the MRI, Dr. Mascenik diagnosed plaintiff with degenerative disc disease with spurring which caused a moderate lumbar stenosis at the L4-5 level. After reviewing a videotape of plaintiff's job, Dr. Mascenik opined that plaintiff's pre-existing condition was worsened by the lifting in her job and that continuing to lift heavy objects would put her at risk for more back pain. He further opined that plaintiff's leg weakness was due to the spinal stenosis.
14. Dr. Mascenik opined that plaintiff experienced an acute exacerbation of her pre-existing condition on 8 October 2003, based upon Dr. Record's notes and his recommendation for an MRI; however, he could not state that the occurrence was work-related. Dr. Mascenik also opined that although plaintiff's job did not place her at a greater risk than that of the general public in causing her degenerative disc disease or spinal stenosis, her job did increase her risk of worsening the condition. He further opined that plaintiff's job aggravated and/or exacerbated her pre-existing condition and caused her to become disabled from work.
15. On 10 December 2003, plaintiff returned to Dr. Record. Plaintiff noted that her back was "still aching some." Dr. Record noted that Dr. Mascenik had referred plaintiff to neurologist, Dr. William Bell for further treatment.
16. Plaintiff presented to Dr. Bell on 12 February 2004. Plaintiff gave a history of lifting heavy parts at work and suffering an injury at work on 8 October 2003. Plaintiff described her current symptoms as back pain and occasional tingling into her legs, with her "entire leg going numb after long periods of standing, sitting and/or walking." After examining plaintiff and reviewing the October 2003 MRI, Dr. Bell diagnosed plaintiff with back pain secondary to multilevel degenerative disc disease, with facet joint changes at L3-4 and L4-5. He recommended physical therapy and medication.
17. Plaintiff returned to Dr. Bell for the last time on 28 June 2004. As the physical therapy did not appear to be helping plaintiff, Dr. Bell recommended facet injections. These injections were eventually performed by Dr. Andrew Kirstein in October 2004.
18. Based upon his review of plaintiff's medical records, his own examinations of plaintiff and a video of plaintiff's job duties, Dr. Bell opined that everyone over the age of 30 has degenerative disc disease and plaintiff's occupation did not cause her degenerative disc condition; however, Plaintiff's job did place her at an increased risk of developing symptoms from the pre-existing spinal stenosis and degenerative disc disease. He further opined that plaintiff's job aggravated or exacerbated her pre-existing condition. In addition, based upon the history provided by plaintiff and her medical records, Dr. Bell opined that plaintiff suffered a traumatic incident on 8 October 2003 that aggravated and exacerbated her pre-existing disc disease and caused her to become disabled from work.
19. Plaintiff continues to be treated by Dr. Record. Based upon his treatment of plaintiff and a review of the video of plaintiff's job, Dr. Record opined that that plaintiff's job did not place her at an increased risk over that of the general public of contracting degenerative disc disease and spinal stenosis, but that it significantly exacerbated and aggravated her condition to the point where she could not work. He further opined that the injury suffered by plaintiff on 8 October 2003, while lifting the control link part at her job aggravated or exacerbated her pre-existing condition causing her to become disabled. Dr. Record based his opinion on the treatment he had provided plaintiff over a period of years and plaintiff's corresponding complaints of back pain; increasing while at work, decreasing while not working and the significant worsening of her condition on 8 and 9 October 2003. Lastly, Dr. Record opined that plaintiff remains disabled from work.
20. James T. Burnette, Ph.D., an ergonomics expert who was accepted without objection, was retained by defendants to assess plaintiff's workplace. He evaluated defendant-employer's plant on 9 September 2004. Dr. Burnette examined the workplace, observed plaintiff's workstation, reviewed the video of plaintiff's job and conducted interviews with plaintiff, Mr. Miller and the plant manager. Dr. Burnette opined that plaintiff's job placed her at a greater risk than that of the general public of exacerbating her existing lower back symptoms. He based his assessment of increased risk in part on his conclusion that plaintiff's job demands were "a mismatch with her abilities."
21. Plaintiff currently suffers from degenerative disc disease, among other ailments. Plaintiff did not contract her condition as a result of her employment, nor did her employment place her at an increased risk over that of the general public of contracting degenerative disc disease.
22. Plaintiff's pre-existing condition of degenerative disc disease was aggravated and exacerbated by her employment with defendant-employer.
23. On 8 October 2003, plaintiff suffered a specific traumatic incident resulting in injury to her back, arising out of and in the course of her employment with defendant-employer while working on the Cincinnati Machine, which necessitated lifting and multiple manipulations of the 11 pound control link part. Plaintiff's injury occurred during a cognizable period of time. During the one and one-half hour period that she worked on the Cincinnati Machine on October 8, 2003, plaintiff's back began to hurt "real bad." As a result of her back injury on 8 October 2003, plaintiff became and remains temporarily totally disabled from employment.
24. Plaintiff's 8 October 2003 back injury aggravated and exacerbated her pre-existing degenerative disc disease. Plaintiff continues to receive treatment for her back condition and has not been released to return to work. Plaintiff has not reached maximum medical improvement.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order for plaintiff to prevail in a claim for benefits based upon an occupational disease, she must show (1) that the condition is characteristic of persons engaged in the particular trade or occupation in which plaintiff is engaged; (2) the condition is not an ordinary disease of life to which the public generally is equally exposed; and (3) that there is a causal connection between the disease and plaintiff's occupation. N.C. Gen. Stat. § 97-53(13). Plaintiff has failed to meet her burden of proving she contracted an occupational disease. The expert medical testimony does not support a conclusion that plaintiff's degenerative disc disease is not an ordinary disease of life to which the public is equally exposed, or that there is a causal connection between the disease and plaintiff's job. Plaintiff has also not proven she suffered a compensable occupational disease because her job aggravated or exacerbated her pre-existing condition of degenerative disc disease. InFutrell v. Resinall Corp., 151 N.C. App. 456, 566 S.E.2d 181 (2002),aff'd per curium, 357 N.C. 158, 579 S.E.2d 269 (2003), the Court held that "a plaintiff seeking to prove an occupational disease [must] show that the employment placed him at a greater risk for contracting the condition, even where the condition may have been aggravated but not originally caused by the plaintiff's employment." See also, James v.Perdue Farms, Inc., 160 N.C. App. 560, 586 S.E.2d 557 (2003). Again, none of the medical testimony supports the theory that plaintiff's job caused her degenerative disc disease.
2. Plaintiff sustained a compensable injury to her back arising out of and in the course of employment as a direct result of a specific traumatic incident of the work assigned by defendant-employer on 8 October 2003. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff has proven that as a result of her compensable injury, she continues to be disabled from work and is entitled to temporary total disability compensation at the rate of $303.00 per week for the period from 9 October 2003 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of her compensable injury for so long as her medical treatment may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay temporary total disability compensation to plaintiff at the rate of $303.00 per week for the period beginning on 9 October 2003 and continuing until further order of the Commission. As much of said compensation as has accrued shall be paid in a lump sum.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from the lump sum due plaintiff and paid directly to counsel. Thereafter, every fourth payment shall be made directly to plaintiff's counsel.
3. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
4. Defendants shall pay the costs.
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_________________ LAURA K. MAVRETIC COMMISSIONER
 S/_________________ DIANNE C. SELLERS COMMISSIONER